UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RAYMOND LEE GIBBS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:24-cv-00001-TWP-KMB |
| ) | |
| TRICIA PRETORIUS ) | |
|   a/k/a TRISHIA PRETORIUS, ) | |
| KAYLA HALL PREA Coordinator, ) | |
| CARRIE SIPICH, ) | |
| KATIE MCMAHON, ) | |
| ) | |
| Defendants. ) | |

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Tricia Pretorius, Kayla Hall, Carrie Sipich and Katie McMahon (collectively "the Defendants"). (Dkt. 50). Plaintiff Raymond Lee Gibbs ("Gibbs") is suing Defendants, alleging that they failed to protect him after he was repeatedly threatened while incarcerated. Because Gibbs has evidence from which a jury could conclude that the Defendants were deliberately indifferent to the risk to him and because Defendants are not entitled to qualified immunity, the motion for summary judgment is **denied**.

**I.   STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir.

1

2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.    FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Gibbs and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

During the relevant time period, the Defendants were all employees of the Indiana Department of Corrections ("IDOC") in the following capacities: Tricia Pretorius ("Warden Pretorius") was the Warden at Plainfield, Kayla Hall ("Hall") was a Prison Rape Elimination Act ("PREA") investigator, Carrie Sipich ("Sipich") was a caseworker, and Katie McMahon ("McMahon") was a Unit Team Manager. (Dkt. 52 at 2).

2

Gibbs was incarcerated at Plainfield Correctional Facility ("Plainfield") from February 2021 to October 2023. Dkt. 51-1 at 8:22-9:20. On November 4, 2021, he was sexually assaulted by Tyrell Morris—another inmate—while housed in Plainfield's Central Dorm with the general population. *Id.* at 12:19-20, 16:14-23, 17:2-6. Gibbs immediately reported the assault to Sergeant Parkhurst, who referred him to Hall, the facility's PREA Coordinator. *Id.* 12:20 to 13:1, 18:1-4, 19:6-11. Hall took Gibbs statement, advised him to lay low and keep quiet about the incident, and arranged for him to be moved out of Central Dorm and into North Dorm, which is another general population dorm. *Id.* 12:22 to 13:4, 20:12-25.

Hall investigated Gibbs's claims over the next 30 days, during which she told Gibbs she would request that Warden Pretorius transfer him to another IDOC facility on an emergency basis pursuant to the PREA policy. *Id.* at 19:25-21:3. She also told Gibbs that he would be transferred at the conclusion of the investigation because Plainfield was not big enough for two individuals involved in such an incident to remain at the same facility. *Id.* at 21:4-12.

In the meantime, Hall arranged for Gibbs to be accepted into the Recovery While Incarcerated substance abuse program in North Dorm and placed him there. *Id.* at 21:18-22:9, 22:16-22. Hall soon concluded her PREA investigation, substantiated the facts reported by Gibbs, and told him there were grounds for (a) placement in protective custody ("PC") and (b) an emergency transfer. *Id.* at 20:1-8, 23:9-10, 66:21-67:3. However, Gibbs was neither transferred to another facility nor placed into PC in Plainfield; rather, Gibbs' bed history report confirms that he was housed in North Dorm while he was in Recovery While Incarcerated program until February 2022. *Id.* 23:17-23; Dkt. 51-7.

Warden Pretorius concedes that the move to North Dorm was made to keep Gibbs separated from Morris. Dkt. 51-2 ¶ 4. However, Morris learned of Gibbs's PREA complaint and

found Gibbs in common areas of the facility, confronting him with threats of violence three times in the chow hall and medication dispensing line ("med line"). Dkt. 51-1 at 13:10-14, 24:1-6, 24:24 to 25:1, 25:7-14, 26:23-24. Morris told Gibbs that either his gang, the Gangster Disciples, was going to retaliate against him for the PREA complaint or he would pay someone else to do so. *Id.* 25:15-25, 27:25-28:3. Gibbs reported each of the threats to Hall, who took his statements and reviewed security camera footage each time. *Id.* 13:14-16, 24:4-6, 28:10-14. Hall told Gibbs that Morris, a member of the Gangster Disciples, was a serious violent felon and she was working with Warden Pretorius to secure an emergency transfer for Gibbs but she had not received a reply. *Id.* 13:17-24, 26:15-16.

Gibbs's general population housing assignment was relocated from North Dorm to South Dorm for just two days before he was physically assaulted by an inmate while he was using the phone. *Id.* 42:2-5, 44:13-17, 44:20-24. He believed this assault was related to the conflict with Morris. *Id.* 43:4-8. The inmate who struck him was a member of the Gangster Disciples who had broken security protocols to get at Gibbs in South Dorm. *Id.* 43:9-14, 44:2-6.

Gibbs applied multiple times to be placed in PC to be kept separated and safe from Morris; the first was denied. *Id.* 14:8, 28:25-29:10. PC at Plainfield involved placement of an inmate into a segregated housing unit where he was kept away from other inmates in the populated areas of the facility. *Id.* 29:21- 23, 67:2-3. However, this PC system had flaws: inmates in PC still went to the chow hall and the med line with other units where other inmates could get access to them. *Id.* 29:24 to 30:12.

Having been threatened multiple times and being exposed to hostility in his general population housing, Gibbs deliberately harmed himself on February 20, 2022, to get himself out of immediate danger and be placed into Self-Lockup, also known as "suicide watch." *Id.* 37:10-

4

11, 66:10-20. While in Self-Lockup, Gibbs first interacted with McMahon. *Id.* 38:19-23. McMahon's purported plan was to protect Gibbs, not by segregating him from inmates who planned to do him harm, but to house him in the Special Needs Acclimation Program ("SNAP") Unit in I-Dorm. *Id.* 14:4-8, 39:11-18, 40:25 to 41:3. The SNAP unit operates similarly to a general population unit, but is more protected, has more structure for inmates, and offers more programming opportunities for inmates. Dkt. 51-5 ¶¶ 6-7.

When an inmate submits a request for PC, the request is reviewed by a committee that presents its findings to the Warden. Dkt. 51-2 ¶ 3. Those who have made a request for PC are housed in the Individual Housing Unit ("IHU") while their PC request is processed. Dkt. 51-4 ¶¶ 2, 4 (Sipich Affidavit). The IHU is comprised of the PC request unit, the SNAP unit, and the segregated housing unit. *Id.* ¶ 3. Gibbs was moved to the SNAP unit because of the reports that he had made of threats and retaliation. Dkt. 51-1 at 31:8-16. To effectuate this move, McMahon required Gibbs to sign a Request to Leave Self-Lockup and a Waiver of Protective Custody, telling him that if he did not sign these forms, she would give him a Class A write-up for refusing a housing assignment, which would have jeopardized his request to transfer to another facility and ended his participation in Recovery While Incarcerated program. *Id.* 14:9-13, 37:19 to 38:1, 41:4-7; Dkt. 51-8 (Signed Forms). To get out of general population and into the SNAP Unit, Gibbs would have to sign the two forms and then, once he was in the SNAP Unit, resubmit his PC request. Dkt. 51-1 at 40:13-22. He signed the forms and relocated to the SNAP Unit on March 4, 2022. *Id.* 41:13-15. The threats, however, continued when he moved to the SNAP Unit. *Id.* 31:17-19. By then, other inmates—not just Morris—were making threats. *Id.* 32:2-6.

Gibbs submitted his second request for PC to the PC Committee—which included Warden Pretorius, Sipich and McMahon—on March 14, 2022. *Id.* 30:19-31:4, 32:7-9, 46:17-19, 50:21-25.

Gibbs told the PC Committee that Morris and his gang had put out a hit on him because of the PREA complaint. *Id.* 32:22 to 33:1. Gibbs learned of the plot on March 7 from a fellow inmate who had overheard Morris talking about the hit. *Id.* 33:1-9. Gibbs reported that information to Hall. *Id.* 35:3-7. Three days later, Gibbs was confronted in the SNAP Unit by two members of the Aryan Brotherhood gang, one of whom pulled a knife and threatened to take the hit on Gibbs and collect the money. *Id.* 33:9-15. That same day, Gibbs participated in self-harm for a second time to get himself removed from immediate danger. *Id.* 66:10-20.

Gibbs submitted a third and final PC request on March 16, 2022. *Id.* 32:12-15. Ultimately, this PC request was approved, but he remained housed in the SNAP Unit. *Id.* 47:23-48:7. The PC Committee decided Gibbs would remain housed in the SNAP Unit and not moved into PC, i.e., administrative segregation in J-Dorm, pending his transfer to another facility. *Id.* 45:21-25; dkt. 61-1 at 8 (McMahon's Resp. to Interrog.). They told Gibbs that their reasoning for that was because practical operations were the same in SNAP as they were in PC—those inmates all went to the med line, commissary and chow hall together. Dkt. 51-1 at 48:10-21.

At this stage, Gibbs was no longer interacting with Hall, but rather with McMahon and Sipich. *Id.* 46:13-19. He spoke with McMahon and Sipich personally regarding his PC requests and was led to believe they were working to get him transferred. *Id.* 46:1-5, 46:20-23. Sipich, who was responsible for Gibbs's transfer requests, did not begin working on his transfer paperwork until April 2022. Dkt. 51-4 ¶ 11 (Sipich Affidavit); dkt. 61-1 at 3-4. Gibbs was not approved for transfer until June 6, 2022. Dkt. 61-2 at 7-8 (Sipich's Resp. to Interrog.).

On May 1, 2022—while he was still housed in the SNAP Unit—Gibbs was attacked and seriously injured. *Id.* 14:21-22, 41:16-18, 45:10-13, 54:17-24. An acquaintance in a nearby cell called for Gibbs to come over. *Id*. 51:23-52:1. As soon as Gibbs came to the door, Dalton Rowe

6

("Rowe"), an inmate who was also in the cell, lunged at Gibbs and stabbed him in the left lower neck and shoulder with a makeshift ice pick. *Id.* 52:3-54:1, 55:15-22. Gibbs did not know Rowe, nor had Rowe ever threatened him before this attack; however, as he lunged at Gibbs, Rowe stated, "This is for the PREA,". *Id.* 52;12-15, 21-25, 53:10-19.

Gibbs's cellmate came in and dragged him to their cell and then he was taken to Eskenazi Hospital. *Id.* 14:22-24, 54:2-9. For three or four days, he received inpatient treatment for a torn left brachial plexus, severe nerve damage, and a stroke which caused left leg paralysis and left drop-foot. *Id.* 14:22-14, 54:12-21, 55:23-56:1. After that, Gibbs was taken to the Plainfield infirmary where he stayed for approximately 30 days. *Id.* 14:24-25.

After he was discharged from the infirmary, Gibbs was moved to PC in the Administrative Segregation Unit. *Id.* 67:10-15. On June 6, 2022, Warden Pretorius finally requested transfer for Gibbs. Dkt. 51-11. Gibbs stayed in PC for several months and did not receive any further threats or attacks while he was there. Dkt. 51-1 57:3-7. Gibbs was transferred to Westville Correctional Facility in October 2022. *Id.* 57:8-13.

### III.  DISCUSSION

Defendants assert that summary judgment should be entered in their favor because they were not deliberately indifferent to a substantial risk of serious injury to Gibbs of which they were aware and because they are protected by qualified immunity. The Court addresses both arguments below.

#### A. Failure to Protect

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to

take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Gibbs must show that (1) Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Officials will only be liable when they disregard that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

1. **<u>Substantial Risk of Serious Harm</u>**

A "complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015). On the other hand, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005).

Defendants do not meaningfully dispute that Gibbs has evidence to show that they knew Gibbs faced a substantial risk of serious injury. Hall, upon concluding her investigation of Mr. Gibb's PREA complaint, told Gibbs that there were grounds to place him in PC and to have him transferred on an emergency basis. Dkt. 51-1 at 20:1-8, 23:9-10, 66:21-25. Gibbs's second request for PC was submitted to the PC Committee, whose members included Warden Pretorius, Sipich, and McMahon. *Id.* 46:17-19, 50:21-25. Gibbs told the PC Committee that Morris and his gang had put out a hit on him because of the PREA complaint. *Id.* 32:22-33:1. With evidence of all four

8

Defendants being aware of the risk to Gibbs, there is no basis for summary judgment due to a lack of knowledge.

### 2. Deliberate Indifference to Risk

To withstand summary judgment, Gibbs must also show that Defendants' conduct was "so culpable as to rise to the level of 'punishment' under the Eighth Amendment," which requires deliberate indifference to his welfare. *Walsh v. Mellas*, 837 F.2d 789, 794 (7th Cir. 1988) (citing *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985)). Defendants' argument, at its core, is that they took reasonable actions in response to the threat that Morris posed to Gibbs. Gibbs's position to the contrary is that those actions fell short of what was constitutionally required.

Gibbs has presented evidence that Hall considered the circumstances presented by the November 2021 PREA complaint against Morris to warrant PC and an emergency transfer for Gibbs but, instead, he was moved from the Central Dorm to North Dorm, which is another general population dormitory. Because the dormitory populations are not kept separate in the chow hall and med line, Morris found and threatened Gibbs three times in these common areas. Morris told Gibbs that either his gang would retaliate against Gibbs or he would put a hit out on him.

Even those people housed in the Individual Housing Units were exposed to danger from contact by other inmates in the common areas of the correctional facility. So, to protect himself from Morris and those acting on his behalf, Gibbs deliberately harmed himself on February 20, 2022, so he would be placed in Self-Lockup. After two weeks there, McMahon told Gibbs that for him to be placed in PC he would need to sign forms requesting to leave Self-Lock up and waiving PC. McMahon told Gibbs that he would be written up if he refused to sign the form waiving PC.

Once in the Individual Housing Unit, two members of a gang—not the same gang that Morris belonged to—threatened to stab Gibbs to collect on the hit Morris placed on him. Gibbs

filed a request for PC upon learning about this hit. On March 10, 2022, Gibbs harmed himself again in order to be put in Self-Lockup. On March 16, Gibbs again requested PC, and the PC Committee approved the request. Pending his transfer, however, Gibbs remained in the same Individual Housing Unit where he had been threatened by gang members who said they were going to collect on the hit. Gibbs was stabbed in the neck on May 1, 2022. His assailant said he was taking revenge for Gibbs's PREA complaint against Morris.

Defendants believe that the facts of this case show that they were not deliberately indifferent. In support, they cite to *Scott v. Reagle*, Case No. 1:23-cv-01631-TWP-CSW, 2024 WL 3594630 (S.D. Ind. Jul 30, 2024). In that case, which was before the court on a motion for a preliminary injunction, the court found that the plaintiff could not show that the defendants were deliberately indifferent where his claimed fear of a gang attack was unsubstantiated and his three requests for PC were denied but he was moved to another housing unit in response to his concerns. *Id.* *4. The case at bar is easily differentiable: Gibbs's complaint was substantiated, and he has presented evidence that he was still in danger from the threat against him in his new dormitory as he received multiple threats from multiple people after his housing transfer.

Defendants also consider this case differentiable from *Sinn v. Lemon*, 911 F.3d 412 (7th Cir. 2018). *Sinn* is not merely differentiable; it is inapposite. The question in *Sinn* was whether the defendants had the requisite knowledge for a failure to protect claim. *Id.* at 420-22. Here, Defendants' knowledge is not at issue. Instead, the question is whether the actions they took were reasonable measures to protect Gibbs. Dkt. 52 at 10.

Defendants note that Hall acted swiftly to move Gibbs to the North Dorm to be away from Morris and investigated and substantiated his claims. Defendants further identify that, other than Morris, no one threatened Gibbs while he was in North Dorm, and he was not assaulted there. This

10

glosses over the facts that Morris was able to find and threaten Gibbs while he was in this housing unit and that Gibbs was moved out of this dormitory because of Morris's threats. Further, while he was in the SNAP Unit members of a gang threatened to harm Gibbs in order to collect on the hit Morris placed on him.

It is not disputed that Defendants took actions in response to Gibbs's requests. The parties' dispute is whether those actions were enough to show that Defendants were not deliberately indifferent to Gibbs's situation. The Court finds that Gibbs clearly has the winning argument. On the facts presented, a reasonable jury could determine that, having granted Gibbs's request for PC due to the threats against him—including threats made in his housing unit—Defendants failed to protect him by returning him to that same housing unit pending his transfer into PC, a process that lasted multiple weeks.

Summary judgment is inappropriate here because there is a triable issue for the jury.

### B. Qualified Immunity

Defendants argue that they are entitled to qualified immunity for their actions. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)).

The Court's analysis above satisfies the first factor—that the facts make out a constitutional violation. Thus, the remaining issue is whether the constitutional right at issue was clearly established.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up).

Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation marks omitted)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

Defendants "have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner, and this is a now well-settled aspect of Eighth Amendment

jurisprudence." *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015). Defendants knew that Gibbs had been threatened in the SNAP Unit by gang members because there was a hit on him. Defendants decided to move him into PC because of the danger to him presented by the hit, but they returned him to the SNAP Unit, *where he had previously been threatened,* until the transfer to PC count be effectuated, a process that lasted multiple weeks. Every reasonable official would have understood that returning Gibbs, while there was a hit out on him, to a place where he had received the threat that precipitated his transfer was an unconstitutional failure to protect him from the known threat. Thus, the Court finds that Defendants are not entitled to qualified immunity.

## IV.   CONCLUSION

For the reasons explained in this Order, the Defendants' Motion for Summary Judgment is **DENIED**. Dkt. [50]. The Court **AFFIRMS** the Final Pretrial Conference scheduled for **February 4, 2026**, at 10:00 a.m. and Jury Trial to begin **March 2, 2026**, at 9:00 a.m.

A scheduling deadline for trial management matters will be issued in due course.

The magistrate judge is asked to hold a settlement conference.

**IT IS SO ORDERED.**

Date: 1/9/2026

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Clinton E. Blanck
BLANCK LEGAL, P.C.
cblanck@blancklegal.com

Elijah B. Mollet
Lewis And Wilkins LLP
emollet@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

Magistrate Judge Barr